498 So.2d 519 (1986)
SAVERS FEDERAL SAVINGS & LOAN ASSOCIATION, Appellant,
v.
SANDCASTLE BEACH JOINT VENTURE an Alabama General Partnership, William P. Lagman, C.C. McGhee, Jr., James M. Herring, Herman Wayne Herring, Donald E. St. Denis, Edward C. Lagman, Sunshine Properties, Inc., an Alabama Corporation, Sunshine Properties International, Inc., a Florida Corporation, Audubon Federal Savings & Loan Association, Sandcastle Beach Homeowner's Association, Freedom Savings & Loan Association, and United States Fidelity and Guaranty Company, Appellees.
No. BL-225.
District Court of Appeal of Florida, First District.
November 14, 1986.
*520 Louis K. Rosenbloum, of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, Pensacola, for appellant.
Clayton W. Crevasse, of Taylor & Van Matre, P.A., Pensacola, for appellees Sandcastle Beach Joint Venture, James M. Herring, Herman Wayne Herring and C.C. McGhee.
Chandler Kite Stanard and Steve Coleman, of Stanard & Mills, Mobile, Ala., for appellee Edward C. Lagman.
BARFIELD, Judge.
Savers Federal Savings and Loan Association appeals a final judgment denying it a deficiency judgment following foreclosure of a condominium project. Savers Federal argues the trial judge erred in the determination of fair market value of the project on the date of foreclosure. We agree that the trial court erred and must therefore reverse the judgment.
Savers Federal was the mortgagee on a 30 unit condominium at Navarre Beach, Florida. Sandcastle Beach Joint Venture was the mortgagor and William and Edward Lagman, C.C. McGhee, James and Herman Herring, Donald St. Denis and Sunshine Properties, Inc. each personally guaranteed the promissory note which the mortgage secured. The note was for a construction loan for $1,600,000.
In May, 1984, Sandcastle defaulted on the note. At the time of default, 22 of the planned 30 condominium units had been constructed, leaving 8 vacant lots. Four of the units had been sold, leaving 18 unsold units.
In November, 1984, Savers Federal instituted a foreclosure action. A final judgment of foreclosure was entered in which the amount of the indebtedness was determined to be $1,543,142.99. Savers Federal purchased the property after bidding $500,000 at the subsequent sale held on March 14, 1985. In June, 1985, Savers Federal moved for a deficiency judgment against the individual and corporate guarantors on the note, contending the property's fair market value was less than the amount of indebtedness determined in the final judgment in the foreclosure.
At the hearing on the deficiency judgment, the only witness to testify to the fair market value of the project was George Pratt Martin, a Pensacola real estate appraiser. *521 It is his opinion that as of March 14, 1985, the date of the foreclosure sale, the value of the property was $1,185,000, assuming all units and lots were purchased by a single purchaser.
Martin used two different appraisal methodologies in reaching his conclusion as to fair market value. First, under a cost approach, he established the replacement cost for the units as new, reduced that by accrued depreciation and added in the value of the vacant lots. Under this cost approach, Martin derived a figure of $1,650,000. This represented a retail value of the property, wherein the owner received a 20% return for profit and overhead and paid all costs of selling the project to individual purchasers over 18 months. However, it was Martin's opinion that the project could only be purchased by a single purchaser, and not by individual purchasers coming forward on the date of the foreclosure sale. Martin therefore reduced this retail figure to a wholesale figure by deducting 28 percent for profit, overhead and indirect costs and reached a combined value of the 18 units and 8 lots of $1,326,000 under a cost appraisal methodology. Under a market analysis appraisal, Martin compared the subject townhouses to sales of other similar units in the area and to sales of completed units in the same project. Using this market comparison, he reached a gross sellout price of $1,660,000, for the 18 units and 8 lots. This value presumed the seller would sell each unit individually over 18 months, based on then-current sales rates.
Martin adjusted this market-based figure of $1.66 million to reach a price which a single purchaser would pay for the entire project on March 14, 1985. He deducted $243,000 for sales expenses and holding costs that would be incurred in selling the 18 units over 18 months following the foreclosure. These costs included $5,000 to ready the units for sale, real estate sales commissions, advertising expenses, closing costs, title insurance, and the interest holding cost for the 18 month sellout period. Martin further reduced the market value by approximately $200,000, which represented a 15% return for profit and overhead, to reach an estimated price of $1,185,000 for one sale of all units and lots together.
Martin testified that under both the cost and market approaches, the retail price included items that had not yet occurred, including sales expenses, holding costs and a profit figure. It was Martin's opinion that an appraisal based on market analysis, rather than on cost, was the better way to establish fair market value. His conclusion was that a willing single buyer would not pay more than $1,185,000 for the entire project.
In his final order, the trial judge found the value of the project to be $1,660,000, which was greater than the amount of the foreclosure judgment. The court stated it accepted part of Martin's testimony and rejected other parts but did not specify what it accepted and what it rejected. It is clear that the only evidence of value came from Martin. The judge held it was impermissible to discount the gross value by certain incremental values in arriving at an adjusted fair market value. The court thus denied a deficiency judgment as the fair market value exceeded the debt owing on the project.
The entry of a deficiency judgment following a foreclosure is left to the sound discretion of the trial judge. But the exercise of that discretion must be within the limits of proof and should not be arbitrary. Horne v. Smith, 368 So.2d 392 (Fla. 1st DCA 1979). The exercise of that discretion allows inquiry into the reasonable and fair market value of the property, the reasonableness of the price at the foreclosure sale and other equitable considerations. R.K. Cooper Construction Co. v. Fulton, 216 So.2d 11 (Fla. 1968); Coppola v. Housing Investment Corp. of Florida, 400 So.2d 112 (Fla. 4th DCA 1981).
The fair market value is defined as the amount that would be paid for the property to a willing seller, not compelled to sell, by a willing buyer, not compelled to buy, considering all reasonable uses to *522 which the property is adapted. State Road Dept. v. Stack, 231 So.2d 859 (Fla. 1st DCA 1969) (defining fair market value under the eminent domain statute.) Fair market value is the sum arrived at through fair negotiation between a willing seller and a willing buyer. Flagship Bank of Orlando v. Bryan, 384 So.2d 1323 (Fla. 5th DCA 1980). The date of the foreclosure sale is the date at which the fair market value is determined. Symon v. Charleston Capital Corp., 242 So.2d 765 (Fla. 4th DCA 1970).
However, beyond these general principles, Florida cases, and those in other jurisdictions, have offered little guidance in how fair market value of foreclosure property is to be determined. This is not surprising since trial judges' are given discretion to determine that value and appellate courts review only for an abuse of that discretion, absent some error in the application of the law.
Here, the trial judge determined that the fair market value on the date of foreclosure was $1,660,000. This value reflects the trial judge's belief the units would be sold on a retail basis and not in bulk to a single purchaser, contrary to Martin's opinion. This is a reasonable exercise of the court's discretion in finding fair market value.
However, the $1.66 million figure overstates the fair market value. First, the value selected was not the amount the project was worth on the date of foreclosure. This is the amount that the appraiser estimated would be realized if the units were sold at a rate of one a month for the next 18 months and the eight vacant lots were sold off at retail value. Thus, the value selected was not the value on March 14, 1985, the date of the foreclosure sale. Second, the figure of $1.66 million included expenses of holding and selling the property to individual purchasers over 18 months. Martin estimated these to be $243,000. These expenses of sale should not be included in fair market value, as fair market value must represent the value on the date of the foreclosure sale. Since the judge found evidence from which to determine value and the only source of that evidence was the opinion of Martin, it was arbitrary to seize upon a qualified figure and ignore the purpose for which that figure was expressed. It was the beginning point and only a component in a formula from which the expert rendered an opinion. In the absence of any other relevant evidence of value, the figure of $1.66 million was meaningless, independent of Martin's opinion and analysis.
The trial judge did act within his discretion in deciding the fair market value should be premised upon an 18 month sellout of the project, thereby rejecting Martin's opinion that a single sale to a single purchaser was the most likely outcome. However, when the trial judge decided to value the property from that retail approach, the trial judge had to accept Martin's otherwise uncontradicted testimony as to value under an 18 month retail sale scenario. Martin's opinion was not that the fair market value was $1,660,000 on March 14, 1985. Rather, fair market value was that figure reduced by the costs of selling the units over a year and a half. The $1.66 million was only a factor used by Martin in arriving at his estimate of fair market value. It was a factor based on other comparable sales which also included the cost of sale. Thus, it was only natural to back out the costs of sale in deriving fair market value. Since Martin's opinion was the only evidence as to fair market value, the trial judge was precluded from rejecting the opinion as to fair market value once he had accepted the underlying premise that retail sale was the proper way to value the project. The trial court's only other alternative was to reject Martin's testimony and find that appellant failed to carry its burden of proof. Such a ruling on the basis of this record would have been an abuse of discretion.
Appellees urge that as a matter of policy discounting to reach a fair market value for foreclosure property should not be allowed. Such a rule would limit the ability of trial courts in determining fair market value in future deficiency actions. *523 Discounting is an important part of the appraisal process, such as here where the appraiser started at a future value and worked backwards to a value as of the date of the foreclosure sale. We therefore reject appellee's argument on this issue.
The trial court's final order denying a deficiency decree is REVERSED. The case is REMANDED to the trial court to reduce the fair market value of $1,660,000 by the estimated costs of sale in the amount of $243,000. The resulting value of $1,417,000 should then be established as the fair market value as of March 14, 1985. The trial court shall enter a deficiency judgment in favor of Savers Federal in the amount of $126,142.99 as the difference between the debt owed of $1,543,142.99 and the fair market value of $1,417,000.
ERVIN and WIGGINTON, JJ., concur.