### 1519

PEOPLES FEDERAL SAVINGS AND LOAN ASSOCIATION and Loyola Federal Savings and Loan Association, Respondents v. MYRTLE BEACH RETIREMENT GROUP, INC., W.L. Williams, Gary R. Craven, Jack E. Shaw, James E. Jordan, Covenant Towers Homeowners Association, Inc., New York Carpet World and John M. Pruitt, Receiver, Defendants, of whom Jack E. Shaw, Gary R. Craven and W.L. Williams are Appellants. Appeal of Jack E. SHAW, Gary R. Craven, W.L. Williams.

(394 S.E. (2d) 849)

Court of Appeals

*Donald H. Stubbs, Joel H. Smith* and *William C. Hubbard* of *Nelson, Mullins, Riley & Scarborough, Costa M. Pleicones* of *Lewis, Babcock, Pleicones & Hawkins*, Columbia, and *Linda Weeks Gwin* of *Thompson, Henry & Gwin*, Conway, *for appellants.*

*Michael W. Battle* of *Lovelace & Battle*, Conway, *Robert W. Dibble, Jr.* and *T. Parkin Hunter* of *McNair Law Firm*, Columbia, *for respondents.*

Heard April 18, 1990.

Decided July 2, 1990.

GARDNER, Judge:

Peoples Federal Savings and Loan Association and Loyola Federal Savings and Loan Association (the S&L's) brought a foreclosure action. Deficiency judgment was not waived, the mortgaged property was sold at judicial sale for $8,300,000 and deficiency judgment of $2,880,000 was entered against the developers, Jack E. Shaw, Gary R. Craven and W.L. Williams. The developers petitioned for an appraisal of the property. A Board of Appraisers was appointed pursuant to statute. The master-in-equity confirmed the appraiser's report. We affirm.

## ISSUES

The issues presented are (1) whether the master erred in holding that his scope of review was limited to either approval or disapproval of the appraisal, (2) whether the master

abused his discretion in affirming the report of the Board of Appraisers whose valuation included a discount for entrepreneurial profit and a discount rate for determining present value.

## FACTS

The foreclosed property of this case is a life care facility known as Covenant Towers. A life care facility is a type of retirement housing which contains a residential complex and provides most of the services necessary to meet the needs of its residents, including houses, an activities center, and a health care center. The facility in this case consists of a total of 159 condominium units and a support center containing an activities center and a 30 bed skilled care nursing center. The foreclosure, however, pertained only to the support center and 105 of the condominium units; the other 54 condominium units were sold prior to the foreclosure.

As noted, the developers petitioned for a statutory appraisal of the property after foreclosure and a Board of Appraisers was appointed.

The three appraisers of the Board were Mr. Yahnis, appointed by the developers; Mr. Christopher, appointed by the Savings and Loans; and Mr. Hedgepath, appointed by the court.

Each of the appraisers used the "discounted sellout" method of valuation or appraisal. The discounted sellout method values property from the perspective of a developer or entrepreneur who purchased the property at the judicial sale and who intends to resell the unit to individual purchasers. Using this method, the estimated value of the condominium units is derived by first determining a projection of the retail sales of all of the units in the foreclosed property. The record reflects that the appraisers estimated the retail sales price of each unit by a comparison of like sales in the community. From this value, the appraisers then deducted development expenses such as advertising, etc., and holding costs such as taxes and insurance and the interest which would have accumulated on the purchase price during the time it took to sell the property. Finally the appraisers deducted the profit which it is assumed would have been realized from the resale of the property. Of course, it is recog-

nized that the purchaser under this method of appraisal would assume both the risk of loss as well as a projected gain. The discounted sellout method of appraisal would not have been used if the appraisers projected a loss from the endeavor. Thus the appraisers arrived at what they found to be the true value.

Mr. Yahnis initially appraised the market value of 105 units at $8,755,000. This he testified is the true value of the units if purchased at one time by one buyer, paying cash. Mr. Yahnis testified that, in accessing the market value of 105 units, he deducted a profit allowance to an entrepreneur of about $150,000 or 3 percent of gross sales. Mr. Yahnis also testified he deducted a certain amount for a time value of the money factor at a discount rate of 13.5 percent. It is our understanding that this represented interest on the investment during the time it would take to sell the property. Mr. Yahnis stated he used the 13.5 percent rate because it was "the market rate that a lender would use to loan this project to a developer."

Mr. Hedgepath valued the property at $8,455,000. This figure, however, includes a "core center" at the development which is not included in the foreclosure action. Mr. Hedgepath testified that he discounted the "retail value" of the units to determine the "market value." He applied a total discount rate of 25 percent. This rate includes a discount for entrepreneur profits and for "cost of money." He did not itemize his 25 percent discount to determine what portion was attributable to the time cost of money or entrepreneur profit. He stated that the "market value" in this case was synonymous with "wholesale value."

Mr. Christopher valued the 105 condominium units at $4,350,000. He testified that he used the same methodology as Mr. Yahnis and Mr. Hedgepath, which is standard in the industry of appraisers. Mr. Christopher deducted a "developers profit" or "entrepreneur profit" of 12 percent and used the 9 percent discount for time value of money. Mr. Christopher testified that he appraised the gross retail sell out value of the units at $8,036,000.

Later, and importantly, the three appraisers met as a committee and agreed on a valuation of the property of $8,120,000, and filed their return which was recorded as a

judgment by the Clerk of Court pursuant to Section 29-3-740, Code of Laws of South Carolina (1976).

The developers appealed the appraisal to the master-in-equity to whom the case was referred with finality. The appealed order, relying on *South Carolina National Bank v. Central Carolina Livestock Market, Inc.*, 289 S.C. 309, 345 S.E. (2d) 485 (1986), held that the trial judge's authority was limited "to either approval or disapproval of the appraisal."

Additionally, the appealed order, in effect, (1) held the appraisers were well qualified with impressive credentials, (2) rejected the borrower's contention that a reappraisal should be ordered, (3) differentiated the cases relied on by the developers and defined true value thusly:

> The phrase "true value" is not clearly defined in the South Carolina appraisal statutes. The general rule appears to be that "true value" is the same as market value or fair market value. Henry Campbell Black, *Black's Law Dictionary*, (5th Edition, 1979); *State Through Dept. of Highways v. Poulan* [Poulan], La. App. 160 So. (2d) 387; *City of Cleveland v. T.V. Cable Co.*, 239 Miss, 184, 121 So. (2d) 862. The appraisers used the same definition of market value as used by the Federal Home Loan Bank Board.[1]

## DISCUSSION

### I.

The thrust of the developers' argument is their contention that (1) the statutory scheme authorizes the trial judge and

[1] The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a. buyer and seller are typically motivated;

b. both parties are well informed or well advised, and each acting in what he considers his own best interest;

c. a reasonable time is allowed for exposure in the open market;

d. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

e. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

*As defined by Federal Home Loan Bank Board Memorandum R41C.

this court to amend the appraisal or in effect reappraise the property and (2) the trial judge and this court have inherent authority to reappraise the property. The master rejected this contention by holding that he was only authorized to confirm the appraiser's report or to disapprove it. Implicit[2] in this ruling is the holding that if the trial judge disapproves the appraisal, under the statute, he has the authority to direct a new appraisal "upon such terms as he may deem equitable."

We hold that whether the master's scope of review was limited to either approval or disapproval of the appraisal and judgment entered thereon is controlled by Section 29-3-750, Code of Laws of South Carolina (1976). To understand this a brief review of the statutory scheme in this state is essential.

The controlling statutes are Section 29-3-660 through Section 29-3-760, Code of Laws of South Carolina (1976). Briefly, a mortgagor defendant in a foreclosure action upon which deficiency judgment is rendered may within thirty days after the sale of the mortgaged property apply to the Clerk of Court for an appraisal. The Clerk of Court shall then issue an order that the property be appraised at its true value as of the date of sale by three disinterested freeholders of the County in which the property is located. Section 29-3-710 provides that both the defendant mortgagor(s) and the plaintiff mortgagee(s) shall each appoint an appraiser and that thereupon the court shall appoint a third. Section 29-3-720 provides that the board of appraisers so constituted shall than appraise the property and shall make a sworn return "of the true value of the property as of the date of sale, taking into consideration sale value, cost and replacement value of improvements, income production and all other proper elements which, in their discretion, enter into the determination of true value." And as noted Section 29-3-740 then provides "[t]he return of the appraisers shall be filed and recorded by the clerk as a judgment of the court and be subject to appeal. . . ." Section 29-3-750 provides that the court "shall hear the appeal without a jury in open court or at chambers upon affidavits or oral testimony as he deems advisable. Such court may confirm the return or order a new appraisal upon such terms as he may

---

[2]The trial judge relied upon *South Carolina National Bank v. Central Carolina Livestock Market, Inc., supra,* which verbalizes the implication here made.

deem equitable and an appeal from his order or decree shall lie as in other equity cases."

The developers in this appeal failed to argue their exception relating to the appraiser's consideration of "sales value, cost and replacement value of improvements, income production. . . ." Failure to argue an exception constitutes an abandonment of it. *Nelson v. Merritt*, 281 S.C. 126, 128, 314, S.E. (2d) 840, 841 (Ct. App. 1984). Also, failure to set forth an exception as a question involved constitutes abandonment of the exception. *Blakeley v. Rabon*, 266 S.C. 68, 221 S.E. (2d) 767 (1976). Having failed to address these issues, we hold that the words "and all other proper elements which, in their discretion, enter into the determination of true value" of Section 29-3-720 become significant to this decision. This is true because the appraisers, under the statute, are required to consider sales value, cost, replacement value of the improvements and income production and failing to do so would constitute an error of law requiring a new appraisal. On the other hand, any other element considered by the appraisers is by statute discretionary.

Section 29-3-720 and that part of Section 29-3-740 which provides that the return of the appraisal shall be entered by the Clerk of Court as a judgment of the court convinces us that in this state the appraisers act in a quasi-judicial capacity insofar as their factual determination of the value of the subject property. This conclusion is bolstered from the case of *South Carolina National Bank v. Central Carolina Livestock Market, Inc.*, 289 S.C. 309, 311-312, 345 S.E. (2d) 485, 487 (1986); from it we quote:

> If an appeal is taken, the Circuit Court hears the appeal without a jury. The Act provides the judge with a veritable smorgasbord of procedures from which to choose in determining the appeal. He may hear the appeal "upon affidavits or oral testimony as he deems advisable." If he determines that the appraisal does represent the true value of the property, he confirms the appraisal and an aggrieved party has the right to appeal to this Court. On the other hand, if the judge determines that the appraisal does not fairly represent the value of the property, he

may "order a new appraisal upon such terms as he may deem equitable."

The developers argue that the above quote is dicta. If so, we, nevertheless, adopt it as part of the ruling of this decision. We hold the only discretion allowed the court by the statute is to order a reappraisal in which event the court is authorized to impose such terms, such as the method of appraisal, as it might in its discretion deem equitable. For this reason we reject the contention that either the trial court or this court has statutory authority or inherent authority to reappraise the subject property.

## II.

Our discussion of the first issue peripherally touched upon the developer's next argument that the board of appraisers erred by including a discount for entrepreneurial profit and a discount rate for present value.

As noted we hold that on appeal, the circuit judge or master in this case may either (1) confirm the report of the appraisers or (2) "order a new appraisal upon such terms as he may deem equitable." No issue as to sale value, cost, replacement of the improvements or income production of the subject property is preserved in this appeal. All other elements for consideration by the appraisals are by the very terms of Section 29-3-720 a matter of discretion vested by the statute in the board of appraisers. A review of the record before us discloses that the appraisers were very thorough in considering the best method of appraisal in this case. The legislature in this state wisely vested with the board of appraisers, as the finders of fact, wide discretion in deciding the best method of appraisal after first addressing the enumerated considerations set forth specifically in Section 29-3-720, which they should address. Of course if the trial court disagrees with the method of appraisal, it has, under the statute, authority to order a reappraisal and in that order set forth the terms which might include the method of appraisal.

After careful consideration we find that the trial judge did not err in accepting the method of appraisal used by the appraisers and in refusing to order a reappraisal.

## CONCLUSION

In summary, we find no error in the trial judge's holding that his authority was limited to either (1) confirming the report of the board of appraisers of (2) disapproving the report and ordering a new appraisal upon such terms as he may deem equitable. We also hold that since the question of whether the appraisers considered sales value, cost and replacement value of the improvements, and income production is not at issue in this appeal, that the other elements and methods of appraisal used by the appraisers were by statute within their discretion and we find no abuse of this discretion.

For these reasons, the appealed order is affirmed.

Affirmed.

CURETON, J., concurs in separate opinion and SANDERS, C.J., concurs in both opinions.

CURETON, Judge (concurring):

I concur fully with the findings and conclusions reached in Part I of the majority opinion. I also agree with my brothers in the majority that the board of appraisers did not abuse its discretion in considering a profit discount in arriving at the true value of the property.

*S.C. Code Ann.* Section 29-3-720 (1976) sets forth a list of factors to be considered in determining the true value of property being appraised. It is undisputed the board took into account entrepreneurial profit. That is, the appraisers reduced their final valuation to reflect a profit to the purchaser of the property on resale of the property.

The developers argue principles of equity dictate that a profit discount is inappropriate when a mortgagee buys property at a foreclosure sale because the lender will realize a profit upon the resale of the property and also be awarded the amount of the discount as part of the deficiency judgment. They argue further that a discount that permits double recovery to the lender cannot be sanctioned by a court of equity. In support of their position they refer us to the cases of *Savers Fed. Sav. & Loan Ass'n. v. Sandcastle Beach Joint Venture*, 498 So. (2d) 519 (Fla. Dist. Ct. App. 1986), and *Cheltenham Fed. Sav. & Loan Ass'n. v. Pocono Sky Enterprises, Inc.*, 305 Pa. Super. 471, 451 A. (2d) 744 (1982).

A review of those cases convinces me they afford the developers little support for the reason the Florida and Pennsylvania deficiency statutes vary greatly from ours. In both jurisdictions, the mortgagee must apply to the court by motion or separate suit for the entry of a deficiency judgment after a sale of the mortgaged premises. Additionally, in both states the court has broad discretion in either determining whether a deficiency judgment will be entered, *Savers Fed. Sav. & Loan*, 498 So. (2d) 519, or the amount of the deficiency to be entered. *Cheltenham*, 451 A. (2d) 744. On the other hand, in South Carolina, a mortgagee whose debt remains unsatisfied after sale of the property is entitled to a deficiency judgment unless the right thereto is waived. *Bartles v. Livingston*, 282 S.C. 448, 319 S.E. (2d) 707 (Ct. App. 1984).

In Pennsylvania a distinction is also made between a lender who buys property at a foreclosure sale and a third party who buys the same property. When foreclosed property is bought by the lender, the judgment creditor must petition the court to fix the fair market value of the real property sold. 42 *Pa. Cons. Stat. Ann.* Section 8103. Thus, the lender has the burden of establishing the market value of the property as a prerequisite to recovering a deficiency. Its failure to do so gives rise to the irrebuttable presumption that the lender has been paid in full. *In re McGrath's Estate*, 159 Pa. Super. 78, 46 A. (2d) 735 (1946); 59 C.J.S. *Mortgages* Section 782(b) (1949).

The object of our appraisal statute is to insure that a mortgagor's property is not sacrificed at a forced sale. This is accomplished by substituting the fair value of the property for the price at foreclosure sale as the amount to be deducted from the debt in order to fix the amount of a deficiency judgment. 59 C.J.S. *Mortgages* Section 782 (1949); G. Osborne, *Handbook on the Law of Mortgages* Section 335 (2d ed. 1970). Unlike some other deficiency statutes, our Act contains no penalties if the lender is the purchaser at the foreclosure sale. See *S.C. Code Ann.* Section 29-3-670 (1976).

Apparently because the Pennsylvania statute makes a distinction between a lender as purchaser and others as purchasers, the *Cheltenham* court thought fair market value should be determined on the basis of "what reasonably the judgment creditor can get out of the property in partial or complete recapture of the loan . . ., but without giving the

judgment creditor an additional profit." *Cheltenham,* 305 Pa. Super. at 480, 451 A. (2d) at 749. The court further stated:

> The gross selling price, as determined from the judgment creditor's viewpoint, seems obviously a higher value than would be offered by an "investor-developer" who is not obliged to take over the property. Such buyer will be induced to buy the property only if his purchase price plus his expected costs will still permit him an attractive profit to compensate him for his knowhow, expertise, risk of loss, and the use of his money. Fundamentally, Henkelman's testimony as to value, apparently adopted by the lower court, is an expression of his opinion of what a speculative investor would pay for the property, rather than an expression of the "fair market value" as between [mortgagee] and [mortgagors], neither of whom is acting willingly or speculatively. Both are trying to get out of an unfortunate situation on the best basis possible.

*Id.*

*Cheltenham* explicitly recognizes that if property is purchased at a foreclosure sale by a nonparty, it is perfectly appropriate to consider an entrepreneur's profit. I discern nothing in the South Carolina case or statutory law which would require us to treat a mortgagee who purchases at a foreclosure sale differently from a nonparty purchaser. The court recognized in *Cheltenham* and there was testimony in this case, that an "investor-developer" would be induced to buy the property only if he could make a profit on a resale of it. Further, the appraisers testified that a discount was proper under recognized appraisal principles. I see no reason why a mortgagee who accepts the risk of buying and disposing of or holding property bought at judicial sale should not be entitled to the same discounts as a third party who takes the same risk. Besides, the developers here are not prejudiced by allowing the lender the discount because they would have been in no better position if a third party had purchased the property at the judicial sale.[1] For these reasons I would hold an entrepreneur's profit is a proper element to consider in arriv-

---

[1] Indeed, it is assumed that because a third party did not buy the property at the foreclosure sale no one else was interested in purchasing the property at the price paid by the lender.

ing at the true value of the property and there was no abuse of discretion by the board of appraisers.